IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REX MEDICAL, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-005 (MN) |
| | ) | |
| INTUITIVE SURGICAL, INC., | ) | |
| INTUITIVE SURGICAL OPERATIONS, | ) | |
| INC., and INTUITIVE SURGICAL | ) | |
| HOLDINGS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

Michael J. Farnan, Brian E. Farnan, FARNAN LLP, Wilmington, DE; Erik B. Milch, COOLEY LLP, Reston, VA; Allison Elkman, COOLEY LLP, Washington, D.C.; Dena Chen, Deepa Kannappan, COOLEY LLP, Palo Alto, CA – Attorneys for Plaintiff

Nathan R. Hoeschen, Karen E. Keller, SHAW KELLER LLP, Wilmington, DE; George Lombardi, WINSTON & STRAWN LLP, Chicago, IL; Claire A. Fundakowski, Joseph C. Masullo, WINSTON & STRAWN LLP, Washington, D.C.; Kelly C. Hunsaker, Michael Rueckheim, WINSTON & STRAWN LLP, Redwood City, CA; Evan Lewis, WINSTON & STRAWN LLP, Houston, TX – Attorneys for Defendants

September 20, 2023
Wilmington, Delaware

*Maryellen Noreika*

**NOREIKA, U.S. DISTRICT JUDGE**

The Court presided over a three-day jury trial from October 17, 2022 to October 19, 2022. (*See* D.I. 259, 260, 261).  At the end, the jury found Defendants Intuitive Surgical, Inc., Intuitive Surgical Operations, Inc., and Intuitive Surgical Holdings, LLC (collectively, "Defendants" or "Intuitive") to have infringed one claim of one patent of Plaintiff Rex Medical, L.P. ("Plaintiff" or "Rex Medical").  (*See* D.I. 245).  In addition, the jury found the claim not invalid and awarded Plaintiff $10,000,000 in damages.  (*See id.*).  Presently before the Court is Defendants' renewed motion for judgment as a matter of law or, alternatively, for a new trial and/or remittitur. (*See* D.I. 266).   In addition, Plaintiff moves for prejudgment and post-judgment interest. (*See* D.I. 264).  For the reasons set forth below, the Court will grant-in-part and deny-in-part Defendants' motion and will deny Plaintiff's motion as moot.

## I.    BACKGROUND

Plaintiff and Defendants are in the business of making and selling medical technology.  At issue in this case is one of Rex Medical's patents: U.S. Patent No. 9,439,650 ("the '650 patent"). The invention of the '650 patent is generally directed to a device for stapling tissue during surgery. (*See* JTX-001; *see also* D.I. 54 ¶ 30).  Defendants develop and sell surgical stapling products. (*See* D.I. 260 at 360:19-370:21).  The accused products are Intuitive's SureForm surgical staplers and reloads, including the SureForm 60 stapler, the SureForm 45 stapler, the SureForm 45 Curved-Tip stapler, and the associated reloads (collectively, "the Accused Products").  (D.I. 211, Ex. 1 ¶ 14).

On January 2, 2019, Plaintiff filed suit alleging that Defendants infringed the '650 patent as well as U.S. Patent No. 10,136,892 ("the '892 patent").  (*See* D.I. 1; *see also* D.I. 54 (Second Amended Complaint)).  On January 6, 2020, the parties filed a joint stipulation, agreeing that Plaintiff's count asserting infringement of the '892 patent (Count II) should be dismissed with

prejudice. (*See* D.I. 48). The Court ordered dismissal of Count II with prejudice the same day. (*See* D.I. 49). Afterwards, the only issue left for trial was direct infringement of the '650 patent. (*See* D.I. 211 ¶ 6).

From October 17, 2022 to October 19, 2022, the Court presided over a jury trial. (*See* D.I. 259, 260, 261). The jury found that Defendants directly infringed claim 6 of the '650 patent. (*See* D.I. 245). In addition, the jury found claim 6 was not invalid for lack of written description and awarded Plaintiff $10,000,000 in damages. (*See id.*).

On November 3, 2022, the Court entered judgment on the jury verdict under Rule 58(b) of the Federal Rules of Civil Procedure. (*See* D.I. 256). On November 28, 2022, Defendants renewed their motion for judgment as a matter of law on the issues of infringement, invalidity, and damages, or, in the alternative, moved for a new trial and/or remittitur. (*See* D.I. 266). On November 28, 2022, Plaintiff moved for prejudgment and post-judgment interest. (*See* D.I. 264). The parties' briefing on post-trial motions was completed on January 27, 2023. (*See* D.I. 264, 267, 275, 276, 278, 279).

## II.   LEGAL STANDARDS

### A.   Judgment as a Matter of Law

Judgment as a matter of law may be entered against a non-moving party if the Court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue." Fed. R. Civ. P. 50(a)(1). Judgment as a matter of law is appropriate "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). Entry of judgment as a matter of law is a remedy to be invoked only "sparingly." *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 383 (3d Cir. 2004).

Following a jury trial, a renewed motion for judgment as a matter of law under Rule 50(b) may be granted only if the movant demonstrates "that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (alteration in original) (quoting *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984)). Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support the finding under review. *See Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 407 (Fed. Cir. 2018). In determining whether substantial evidence supports the jury verdict, the Court may not make credibility determinations, weigh the evidence, or substitute its own conclusions for that of the jury where the record evidence supports multiple inferences. *See Lightning Lube*, 4 F.3d at 1166.

B.  **Motion for a New Trial**

A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Common reasons for granting a new trial are: (1) the jury's verdict is against the clear weight of the evidence and a new trial is necessary to prevent a miscarriage of justice; (2) there exists newly discovered evidence that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the Court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent. *See Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 85 F. Supp. 3d 768, 775 (D. Del. 2015).

The decision of whether to grant a new trial is a question committed to the Court's discretion. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980). Unlike the standard for judgment as a matter of law, the Court need not view the evidence in the light most favorable

to the verdict winner when ruling on a motion for a new trial. *See Ateliers*, 85 F. Supp. 3d at 775-76. "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).

## III.   DISCUSSION

### A.   Defendants' Motion

#### 1.   Patent Infringement

"To prove infringement, the patentee must show that an accused product embodies all limitations of the claim either literally or by the doctrine of equivalents." *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1340 (Fed. Cir. 2013). "A two-step analysis is employed in making an infringement determination." *Intell. Ventures I, LLC v. Canon Inc.*, 104 F. Supp. 3d 629, 638 (D. Del. 2015) (citing *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995)). "First, the court must construe the asserted claims to ascertain their meaning and scope." *Id.* Second, the trier of fact must "compare the properly construed claims with the accused infringing product" to determine whether the product embodies the claims as construed. *Id.* "This second step is a question of fact." *Id.* (citing *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998)).

The jury unanimously found that Defendants infringed claim 6 of the '650 patent. Defendants argue that no reasonable jury could have found infringement. For the reasons set forth below, the Court disagrees.

#### a.   "Lower Portion"

First, Defendants contend that Plaintiff's infringement expert, Mr. Juergens, improperly identified different portions of the accused SureForm I-beam as the claimed "lower portion."

4

(D.I. 267 at 11-12).   Claim 6 recites a beam comprising an upper portion and lower portion where "at least one of the lower portion or the upper portion" is "configured to cause the staple pusher to move a staple" and "configured to cooperatively engage" the jaws.  (JTX-001, cl. 6).  The Court construed "lower portion" before trial.  (*See* D.I. 259 at 106:2-107:5; *see also* D.I. 220 at 106:25-109:14 (requesting briefing on the term at the Pretrial Conference)).   After reviewing the parties' briefing on the term, the Court noted that "the dispute appears to be whether the scope of this term may include additional material or structures that extend in a perpendicular direction from the [lowermost] section of the beam."  (D.I. 259 at 106:15-18).   The Court found "nothing in the intrinsic evidence to require narrowing the construction" to preclude such material.  (*Id.* at 106:22-23).  Thus, the Court found that "the term may include additional materials or structures that extend in a perpendicular direction beyond the lowermost section of the beam," but noted that "whether the material of the Accused Products extends so far as to no longer be part of the 'lower portion'" was an issue of fact for the jury.  (*Id.* at 106:25-107:5).

At trial, Mr. Juergens opined that the Accused Products meet the relevant limitations of claim 6 in part because the lower portion is configured to cause the staple pusher to move a staple and to cooperatively engage the jaws.   (D.I. 260 at 291:4-299:9).   Applying the Court's construction, he identified the "lower portion" as including the lowermost section of the accused I-beam and some material that extends in a perpendicular direction beyond that lowermost section. (*See id.* at 291:4-293:18).  Then he explained to the jury how the "lower portion" performs the required functions.  For example, Mr. Juergens testified that the "section of the lower portion . . . which sticks up into the channel . . . is the portion that actually contacts . . . the sled which then in turn contacts the staple pusher to move the staple as the beam move[s] from the proximal to the distal [location]."  (*Id.* at 294:18-25).

Defendants take issue with the fact that Mr. Juergens identified two "different" parts of the "lower portion" of the I-beam as performing each specified function.  That is, Mr. Juergens identified the lowermost part as the part of the I-beam "configured to cooperatively engage" the jaws and identified the section above the lowermost part as the part of the I-beam that is "configured to cause the staple pusher to move a staple."  (*See* D.I. 267 at 11).  As Plaintiff points out, however, nothing in the claim language or the Court's construction precludes two different parts of the lower portion from performing each of these functions.  Rather, the claim merely requires that the "lower portion" perform both.  The jury heard substantial testimony from Mr. Juergens that the lower portion performs both functions and it was entitled to credit that testimony.  (*See* D.I. 260 at 291:4-299:9).

### b. "Configured to Cause"

Second, Defendants argue that Plaintiff failed to show that the Accused Products meet the claim limitation "at least one of the lower portion or the upper portion configured to cause the staple pusher to move a staple" because (a) Plaintiff failed to show that the lower portion actually causes the staple pusher to move a staple and (b) Mr. Juergens' testimony was inconsistent with the Court's construction of "configured to cause."  (*See* D.I. 267 at 13-17 (quoting JTX-001, cl. 6)).

With respect to whether Plaintiff showed that the lower portion in fact causes the staple pusher to move the staple, the jury heard substantial evidence that in the Accused Products, the protruding part of the lower portion contacts the shuttle which in turn causes the staple pusher to move a staple.  (*See* D.I. 260 at 293:19-297:14).  For example, Mr. Juergens explained that the I-beam's web is "chamfered" such that contact between the web and the shuttle is minimized and the protruding piece of the lower portion is "a significant driving factor" contributing to the mechanical force generated by the beam onto the shuttle.  (*Id.* at 295:6-297:14, 350:4-351:7). Defendants contend that Mr. Juergens' testimony was based on "speculation."  (*See* D.I. 267 at

6

16).   Mr. Juergens, however, based his testimony on his observations of the physical product as well as Defendants' own produced videos.   (*E.g.*, D.I. 259 at 227:6-230:13; D.I. 260 at 294:16-295:23; D.I. 259 at 233:24-234:5; JTX-039; PTX-030; PTX-118; PTX-112).   The jury was entitled to credit Mr. Juergens' opinion and find that the protruding portion does in fact cause the staple pusher to move a staple.

With respect to Defendants' assertion that Mr. Juergens' opinion contradicts the Court's construction, the Court finds that it does not.   The Court construed the term "at least one of the lower portion or the upper portion configured to cause the staple pusher to move a staple" as "at least one of the lower portion or the upper portion is designed, constructed or set up to cause the staple pusher to move a staple."  (D.I. 76 at 8).   Defendants argue that Plaintiff has failed to show infringement under this construction because Mr. Juergens did not know whether the accused "lower portion" was intentionally designed to cause the staple pusher to move a staple.   The Court, however, did not construe "configured to cause" as requiring intention on the part of the product developers.[1]   Thus, Plaintiff was not required to present evidence on such intention.[2]   As noted above, the jury heard substantial evidence that the design actually enables or causes the staple

---

[1]   As Plaintiff points out, such a construction might allow "any defendant [to] avoid infringement of a 'configured to' claim by providing self-serving testimony that it did not subjectively *intend* to design the element to operate that way."  (D.I. 276 at 14).

[2]   The cases Defendant cites are inapposite.  In both *Acuity* and *Aspex*, the issue was whether the claim language merely required "the hypothetical ability to do something."  *See Acuity Brands Lighting, Inc. v. Ultravision Techs., LLC*, No. 19-2207-MN, 2021 WL 3187439, at *7 (D. Del. July 28, 2021); *see also Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012) ("[T]he phrase 'adapted to' is most naturally understood to mean that the arms and magnetic members are designed or configured to accomplish the specified objective, not simply that they can be made to serve that purpose.").  Here, Plaintiff did not argue that the accused lower portion is hypothetically capable of causing the staple pusher to move a staple.  Rather, Plaintiff put forth substantial evidence that it in fact does so.

pusher to move the staple.  (*See* D.I. 260 at 293:19-297:14).  That is sufficient for the jury to find that the lower portion is configured to do so.

In addition, Defendants argue that (a) it is the shuttle and/or the web that is configured to cause the staple pusher to move a staple and (b) the lower portion is configured to engage the lock-out mechanism and thus cannot also be configured to cause the staple pusher to move a staple. (*See* D.I. 267 at 15-16).  Even if these statements were true, they do not preclude the jury from finding that the lower portion is also configured to cause the staple pusher to move a staple. Regardless, the jury was entitled to weigh the evidence and credit Mr. Juergens' opinion that the lower portion is a "significant driving factor" in moving the shuttle and is configured to cause the staple pusher to move staples.  The Court sees no reason to disturb the jury's verdict.

### c.    "Alignment"

Finally, Defendants argue that Plaintiff presented no evidence that Intuitive's I-beam maintains "alignment."  (D.I. 267 at 17).  Independent claim 4 requires that "the second distance and the alignment" are "maintained by a beam."  (JTX-001, cl. 4).  At trial, Mr. Juergens testified in detail that the I-beam maintains parallel alignment such that each staple "sit[s] opposite each little . . . pocket[] in the anvil, so that when the stapler is fired those staples hit those pockets and get curled down into a properly shaped staple configuration."  (*See* D.I. 260 at 278:18-284:1).  He explained and demonstrated his opinion using Intuitive's own documents and the physical product. (*See id.* (referring to JTX-010, JTX-002, JTX-003)).  Defendants now repeat their expert's opinion presented at trial; that is, that the accused I-beam does not meet this limitation because it does not maintain lateral alignment (*i.e.*, keeps the jaws from moving left to right).  The claim language, however, does not limit the term "alignment" in such a way.  Mr. Juergens explained the difference between parallel and lateral alignment at length and ultimately opined that the I-beam maintains

parallel alignment and thus meets this claim limitation.  (*See* D.I. 260 at 281:25-284:1).  The jury was entitled to assess the credibility of the witnesses[3] and credit Mr. Juergens' opinion.

In addition, Defendants contend that Mr. Juergens' opinion improperly conflates "second distance" and "alignment."  (D.I. 279 at 9).  Mr. Juergens, however, explained the distinction between the two terms: alignment is when they jaws are "parallel to each other" and the distance is "once they're parallel, are they this far apart or that far apart."  (D.I. 260 at 279:1-280:20).  Thus, the jury was entitled to weigh the evidence presented and find that the Accused Products meet this claim limitation.

*          *          *

In sum, substantial evidence supports the jury's finding that Defendants infringed the '650 patent.  Therefore, the Court must deny Defendants' renewed motion for judgment as a matter of law on infringement.

### 2.      Patent Validity

An issued patent is presumed valid.  *See* 35 U.S.C. § 282.  To overcome this presumption, a party must show by clear and convincing evidence that the patent is invalid.  *See Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* 909 F.2d 1464, 1467 (Fed. Cir. 1990).  At trial, Defendants challenged the validity of claim 6 of the '650 patent for failure to meet the written description requirement.  The jury found that Defendants failed to prove by clear and convincing evidence that the asserted claim of the '650 patent is invalid.  (*See* D.I. 245).  Defendants now argue that no reasonable jury could have found that Defendants failed to meet their burden.  For the reasons set forth below, the Court disagrees.

---

[3]      For example, the jury was entitled to discredit Mr. Wixey's testimony after hearing that, despite being an engineer, he did not understand what vertical as opposed to lateral alignment meant.  (*See* D.I. 260 at 398:22-400:2).

For a patent to be valid, its specification must contain a written description that "clearly allow[s] persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (second alteration in original) (quoting *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991)). "In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.*

Defendants argue that they have put forth clear and convincing evidence that the '650 patent lacks adequate written description because the patent fails to disclose (a) a shuttle and (b) a cable being coupled to a beam which in turn closes the jaws. (D.I. 267 at 18-19). The Court finds that the jury was entitled to find that Defendants failed to meet their burden with respect to both arguments.

First, with respect to the shuttle, Defendants contend that the '650 patent "discloses a single embodiment describing a 'lower portion' 'configured to' engage a jaw and to cause a staple pusher to move a staple" and states that "nothing" in the patent includes a shuttle involved in those functions as well. (D.I. 267 at 18). The question, however, is not whether the specification provides an adequate description of the Accused Products, but whether the specification provides an adequate description of the claimed invention. *See Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1321 (Fed. Cir. 2003); *Inline Connection Corp. v. EarthLink, Inc.*, 684 F. Supp. 2d 496, 534 (D. Del. 2010). Furthermore, "an applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001).

Defendants' expert, Dr. Howe, briefly opined that the '650 patent "lacks written description" with respect to the "configured to cause" element.  (*See* D.I. 260 at 438:3-441:19). The closest his testimony comes to supporting Defendants' argument is the following:

> Q: So where is the shuttle in Figure 15?
> A: There is no shuttle.
> Q: Does Rex Medical's patent use the word shuttle at all?
> A: No, it's very clear that these inventors didn't have the idea of a
> shuttle. Their invention didn't involve shuttles in any way.

(*Id.* at 440:17-23).  The jury was entitled to find that this is not clear and convincing evidence. This is true particularly because the jury heard evidence to the contrary.  Defendants' own engineer testified that "this shuttle pusher and staple configuration has been around for probably years" and is "very typical in any endoscopy stapler," describing it as a "commonly used mechanism."  (*Id.* at 387:9-16).  Plaintiff's expert, Mr. Juergens, testified that the patent has adequate written description in part because "shuttles were known at the time."  (D.I. 261 at 531:11-532:25). Dr. Howe agreed that "in 2001, a shuttle was known to a person of skill in the art . . . [f]or use in tissue stapling devices."  (D.I. 260 at 473:10-14).  In some circumstances, as is the case here, "[b]ecause the specification is viewed from the perspective of one of skill . . . a patentee may rely on information that is 'well-known in the art' for purposes of meeting the written description requirement." *Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011) (citing *Falko–Gunter Falkner v. Inglis*, 448 F.3d 1357, 1366-68 (Fed. Cir. 2006)).  Thus, the jury had sufficient basis for finding that Defendants failed to meet their burden.

Second, Defendants contend that the '650 patent describes "only one cable 'operatively coupled' and 'configured to move' the jaws" and thus does not disclose "a device where a cable is coupled to a beam, and a beam closes the jaws."  (D.I. 267 at 19).  Again, the patent need not describe every possible embodiment.  *See Rexnord*, 274 F.3d at 1344.  Mr. Juergens testified that

there is adequate written description with respect to this element based on Figures 9, 10 and 12 which he opined show "clear possession" of "intermediary structures" [4] where "multiple gears and cables" were operatively coupled to the jaws. (D.I. 261 at 527:1-529:18). Dr. Howe only briefly testified that the '650 patent "does not" disclose a beam being used to close the jaws because it is a "different mechanism" than what is shown in the patent. (D.I. 260 at 447:10-448:9). The jury was entitled to weigh the evidence and find that Defendants failed to put forth clear and convincing evidence of invalidity.

Defendants have provided no basis on which the Court may grant judgment as a matter of law of invalidity of the '650 patent.

### 3.    Damages

The jury awarded Plaintiff $10,000,000 as a reasonably royalty. Defendants argue that there is no evidence to support the jury's damages award and request the Court enter judgment as a matter of law of no damages or, in the alternative, remittitur of nominal damages. For the reasons below, the Court agrees that Plaintiff has failed to prove its damages, and thus the Court will remit the damages award to nominal damages of $1.

Prior to trial, Defendants moved to preclude Plaintiff's damages expert, Mr. Kidder, from testifying. (*See* D.I. 165). Defendants argued, in part, that Mr. Kidder's opinion regarding a reasonable royalty was unreliable because he failed to apportion the Covidien license to account for other patents. *See Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022) ("When relying on comparable licenses to prove a reasonable royalty, we require a party to 'account for

---

[4]     The Court construed "operatively coupled" to have its plain and ordinary meaning and clarified, in response to the parties' dispute, that the term "may include structures in which the gear and/or the cable is operatively coupled to the first jaw and/or the second jaw through a series of intermediary structures that ultimately move the first jaw and second jaw from the first configuration to the second." (D.I. 259 at 105:16-105:22).

differences in the technologies and economic circumstances of the contracting parties.'" (quoting *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014))).  The Covidien license stems from prior litigation between Rex Medical and third-party Covidien.  In 2019, Rex Medical sued Covidien, asserting infringement of the '650 patent and the '892 patent.  (*See* D.I. 166 at 4).  Prior to settlement negotiations, Rex Medical dropped the '650 patent from its case, leaving only the '892 patent at issue.  (*See id.*).  Rex Medical and Covidien then settled the litigation and entered into a license agreement (i.e., "the Covidien license") that covers the '650 patent and '892 patent along with eight other U.S. patents, seven U.S. patent applications, and nineteen patents or applications from countries outside of the United States.  (*Id.* at 4-5; JTX-007).

The '650 patent was the only patent asserted in this case.  In his expert report, Mr. Kidder used the Covidien license as a starting point to assess the result of the hypothetical negotiation between the parties and to estimate a reasonable royalty.  (*See* D.I. 166, Ex. 7 ¶ 59).  The Court ruled on Defendant's *Daubert* motion as follows:

> Defendants contend that Mr. Kidder used unreliable methods because (1) he failed to apportion the value of the Covidien license between the '650 and '892 patents and (2) he failed to adequately address the value of the patents licensed other than the '650 and '892 patents.  (*See* D.I. 166 at 6-10).  In *Apple*, the defendant's damages expert, Mr. Kennedy, had relied on "comparable agreements" that defendant was a party to in order to estimate a reasonable royalty.  *Apple Inc.*, 25 F.4th at 971-72.  One of the agreements listed one of the patents at issue as an "Asserted Patent" along with five other asserted patents.  *Id.* at 973.  The court observed, "Mr. Kennedy failed to address the extent to which these other patents contributed to the royalty rate in the Vertu license.  Yet he opined that excluding these patents (and the rest of [defendant's] portfolio) from the hypothetical negotiation would have netted Apple only a 25 percent discount."  *Id.*  The court thus held that "Mr. Kennedy's silence on these equally situated patents is troubling and makes his opinion unreliable."  *Id.* at 973-74.
>
> Here, Mr. Kidder assesses the relative value of the patents with the following:

> Most of the value to a license to Rex Medical's patent portfolio to Covidien and/or Intuitive is contained in a license to either the '892 Patent or the '650 Patent. The fact that Rex Medical has only asserted the '892 Patent and the '650 Patent against Covidien and Intuitive indicates that these two patents have the most value to these two companies. Additionally, as discussed previously, the '892 Patent and the '650 Patent describe different design choices but the same stapling innovation. The Rex Medical patent portfolio thus appears to follow the extreme skew in values for most patent portfolios – most, if not all, of the value is contained in the most valuable patent or patents. Thus, the additional value obtained by Covidien for rights to patents other than the '650 and '892 Patents likely accounted for little-to-no value to Covidien. . . . This agreement suggests that a starting point for a Georgia-Pacific analysis is [the lump sum paid by Covidien], subject to some adjustment due to the fact that Covidien obtained rights to patents other than the '650 Patent.

(*See* D.I. 166, Ex. 7 ¶¶ 69-71) (internal citations omitted). Plaintiff argues that Mr. Kidder properly apportioned between the '650 patent and the other patents in the Covidien license. With respect to Defendants' first contention, Plaintiff argues that Mr. Kidder properly explained his apportionment between the '650 and '892 patents because "[i]n Mr. Kidder's opinion, the rights to one of the patents granted the majority of the value; rights to the second patent added only minor design modifications." (D.I. 182 at 9). Plaintiff, however, cites to nothing in Mr. Kidder's report in support of this assertion, and the Court is unable to find this explanation in Mr. Kidder's reports. Rather, Mr. Kidder admitted that he "didn't allocate the [lump sum] at all between the '650 and '892 patent[s]." (D.I. 166, Ex. 1 at 49:6-13). With respect to Defendants' second contention, Plaintiff points to Mr. Kidder's opinion that the other patents "likely accounted for little-to-no value to Covidien." (*See* D.I. 182 at 11 (quoting D.I. 166, Ex. 7 ¶ 69)). Mr. Kidder based his opinion on the fact that the '650 and '892 patents were the only patents originally asserted and cover "different design choices but the same stapling innovation." (*See* D.I. 166, Ex. 7 ¶ 69). Mr. Kidder, however, admitted that he never "analyze[d] whether any of Rex Medical's licensed foreign patents cover the same stapling innovation as the '650 or '892 patents" and never "analyze[d] whether any of Rex Medical's licensed foreign patents cover any of Covidien's products." (D.I. 166, Ex. 1 at 55:10-56:7).

> Mr. Kidder thus cannot reliably opine that the other patents account for "little-to-no value to Covidien." Mr. Kidder has failed to adequately address the extent to which '892 and the other patents contributed to the lump sum payment in the Covidien license. Therefore, the Court finds that Mr. Kidder's methods in relying on the Covidien license are unreliable and must be excluded.

(D.I. 230 ¶¶ 10-11).

Although the Court precluded Mr. Kidder from testifying about the Covidien license, the Court repeatedly made clear that it did "not wholesale preclude [Mr. Kidder] from testifying [] if he has additional testimony that is relevant to damages."[5] (D.I. 260 at 275:6-13). At trial, however, Plaintiff chose not to call Mr. Kidder at all. Rather, Plaintiff chose to put forth its damages case primarily through the fact testimony of Mr. Carter, the President of Rex Medical, who was involved in negotiating the Covidien license.[6] Despite the fact that the Court had already identified issues with respect to the comparability of the license, Plaintiff made the $10,000,000 Covidien license the foundation of its damages case. (*See, e.g.*, D.I. 261 at 577:4-12; *see also id.* at 488:4-492:11; D.I. 276 at 10 (arguing the jury's verdict "was directly rooted in the $10 million Covidien paid and the unrebutted witness testimony")). Plaintiff requested $10,000,000 in damages, and the jury awarded that amount. (D.I. 261 at 577:4-578:15; D.I 245).

Now, Defendants argue that the jury award is not supportable because Plaintiff failed to offer any evidence of apportionment of the Covidien license at trial that would allow it to serve as

---

[5]   In fact, the Court denied Defendants' *Daubert* motion in part. (D.I. 230 ¶ 12).

[6]   Defendants objected to the Covidien license being introduced through Mr. Carter's testimony on the grounds that he lacked sufficient personal knowledge about how the $10,000,000 figure was determined. (D.I. 259 at 16:19-19:22). The Court overruled the objection, reasoning that both parties agreed the license was relevant and that Mr. Carter had sufficient knowledge to discuss the license because he negotiated it. (*Id.* at 22:11-22:20).

a basis for damages and there is no other evidence to support the jury's $10,000,000 award.  The Court agrees the award is not supportable.

There was no evidence at trial that would allow the jury – or the Court – to ascertain the value of the '650 patent based on the Covidien license.  The only witness to testify about the Covidien license was Mr. Carter.  His testimony pertaining to the amount paid by Covidien consisted of the following:

> Q: How did the Covidien license happen?
> A: Well we reached out to Covidien many years ago to discuss licensing opportunities, however they didn't take our company very seriously. So we filed a complaint in [mid-2019] asserting two patents, the '650 and the '892 patent.
>  . . .
> Q: What were the patents asserted against Covidien?
> A: The '650 and the '892.
> Q: Were there any foreign patents asserted against Covidien?
> A: No, there were not.
> Q: Besides the '650 and the '892 patent, were any other patents asserted against Covidien?
> A: No, there were not.
>  . . .
> Q: Did you know what were Covidien sales?
> A: No, I did not.
>  . . .
> Q: What factors did Rex Medical consider?
> A: Well, we considered that Covidien would settle very early in the litigation process when there was uncertainty, they were very cooperative, they wanted special language in the license, they didn't challenge our patents in the Patent Office –
>  . . .
> A: . . . to try to get it invalidated and they saw real value in licensing the '650 and the '892 Patents.
> Q: How do you know Covidien saw real value in Rex Medical?
> A: Because they paid us $10 million, this wasn't just a cost of litigation settlement, they said we value those two patents and we're going to pay you [$]10 million.

(D.I. 259 at 165:10-169:11).

This testimony fails to provide any basis from which a factfinder could assign any portion of the $10,000,000 to the '650 patent alone. Even if there is enough in the record to apportion the license with respect to the non-asserted patents[7] (i.e., those other than the '650 and '892 patents), there is nothing in the record that addresses the extent to which the '650 patent – as opposed to the '892 patent – contributes to the $10,000,000 sum.[8] In fact, Mr. Carter admitted that he could not assign any value to the '650 patent. (*Id.* at 200:10-14). Plaintiff has thus failed to establish that the license is comparable to the hypothetical negotiation. *See, e.g.*, *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1379-81 (Fed. Cir. 2021) (testimony that "certain licenses included a royalty of $5.00 per unit regardless of 'which patent' was included because 'no patent was any more valuable than the others'" failed to "account[] for the technological and economic differences between th[e] licenses" (alterations in original)). So, for the same reason that the Court precluded Mr. Kidder from testifying about the license, given the evidence at trial about that agreement, the jury could not rely on the license to determine a reasonable royalty either.[9]

---

[7]     For example, there is testimony that the '650 and '892 were the only patents asserted in the Covidien litigation and that many of the other patents had lapsed or expired. (D.I. 259 at 166:6-14; 176:22-177:9). There was, however, also evidence that one foreign licensed patent was filed in 2002 and issued in 2010. (*See id.* at 177:6-180:12; DTX-539; JTX-007).

[8]     Based on the evidence presented at trial, it is entirely possible that the entire value of the Covidien license is attributable to the '892 patent alone. Furthermore, the fact that, at the time Rex Medical and Covidien entered settlement negotiations, the '650 patent had been dropped from the litigation seems to suggest that the '892 patent may have held more value to Covidien. (*See* D.I. 166 at 4).

[9]     Furthermore, Plaintiff failed to offer any evidence as to the value of the patented technology in the Accused Products as compared to the non-patented features. Claim 6 is the sole asserted claim in this case. Claim 6 depends on claims 4 and 5 which have both been invalidated. (*See* D.I. 166 at 17). Plaintiff has failed to provide evidence from which a factfinder could attribute a specific value not only to the '650 patent as a whole but also to the sole asserted claim of the patent.

The remaining evidence adduced at trial fails to provide any basis for a factfinder to tie a dollar amount to the value of the '650 patent or support the $10,000,000 award.  For example, Plaintiff cites to testimony including about the "market opportunity Defendants saw" and the "stipulated fact regarding accused product sales."  (D.I. 276 at 7 (citing D.I. 260 at 354:19-358:24, 476:2-4)). [10]  This evidence fails to provide anything more than an entirely speculative basis for assigning value to the asserted patent.  Therefore, the Court finds that the jury award is unsupported by the evidence.

Defendants request judgment as a matter of law of no damages or remittitur to nominal damages.  Plaintiff argues that, if the Court offers Defendants any relief, the Court should hold a new trial on the damages issue and allow it to reopen discovery.  The Court sees no reason to give Plaintiff a second chance at discovery and trial. [11]  Plaintiff has failed to meet its burden to prove its damages.  A plaintiff is not entitled to an award of damages when none have been proven.  *See TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020) ("The statute does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts."); *see also Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017) ("[A] district court does not abuse its discretion by declining to give [a] plaintiff multiple chances to correct deficiencies in its argument or the record.").

---

[10]  Plaintiff also cites to testimony "regarding Plaintiff's agreements" and the "patented invention and benefits," as well as that "no single prior art described the claimed invention" and that "preexisting devices were inferior."  Plaintiff, however, does not tie this testimony to any particular value of the '650 patent.

[11]  Plaintiff had the opportunity to conduct discovery and to call other witnesses, such as its damages expert, to offer other evidence potentially relevant to damages.  (*See* D.I. 261 at 511:2-23).  Instead, Plaintiff chose to hinge its damages theory on the very license that the Court had already precluded its expert from testifying about.

Here, the record is wholly lacking in evidence that would allow the Court to determine the value of a reasonable royalty for the '650 patent.  Therefore, the Court will remit the jury's award to nominal damages of $1.  *See TecSec*, 978 F.3d at 1291-92 ("[W]e have previously stated that 'in a case completely lacking any evidence on which to base a damages award, the record may well support a zero royalty award." (quoting *Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1328 n.7 (Fed. Cir. 2014))); *AOS Holding Co. v. Bradford White Corp*, No. 18-412-LPS, 2021 WL 5411103, at *38 (D. Del. Mar. 31, 2021) (awarding "only nominal damages of $1" for a certain portion of infringement for which Plaintiff failed to put forth any evidence).

### 4.   New Trial

If the Court upholds any of the jury's liability findings, Defendants request a new trial in the alternative for various reasons.  The Court finds that none of Defendants' cited reasons merit granting a new trial.

First, Defendants contend that, even if the Court finds that judgment as a matter of law is not warranted on any of the issues it requests, the Court should grant a new trial because the "the jury's liability findings are against the great weight of the evidence."  (D.I. 267 at 19).  As noted above, the Court has found that the jury's infringement and validity findings are supported by substantial evidence.  Therefore, the Court sees no reason to disturb the jury's verdict with respect to those issues.  *See Williamson*, 926 F.2d at 1353 ("[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience.").

Second, Defendants argue that the jury's verdict was improperly influenced by Mr. Carter's testimony, during which he mentioned a $30,000,000 damages number and provided "hearsay testimony to the jury about when certain licensed patents expired."  (D.I. 267 at 19).  The testimony

19

Defendant complains of goes to the damages award, which the Court has remitted.  Thus, the issue of whether to grant a new trial with respect to this issue is moot.[12]

Finally, Defendants argue that a new trial is warranted because Plaintiff's counsel argued the wrong legal standard for written description in its closing argument by referring to Mr. Juergens' testimony about what was known in the prior art in 2001.  (D.I. 267 at 20).  The jury, however, may consider the context of the state of knowledge at the time of invention in making its written description determination.  *See Zoltek Corp. v. United States*, 815 F.3d 1302, 1308 (Fed. Cir. 2016).  Regardless, the Court read instructions to the jury which included the correct standard for written description.  (D.I. 261 at 557:6-558:18).  Furthermore, Defendants' own counsel arguably warped the legal standard during their own closing argument.  (*See id.* at 593:16-18 (arguing "[y]ou can look through that patent word by word and you won't see a shuttle" in making its written description case to the jury)).  Therefore, the Court does not find that the jury's verdict was unfairly influenced.

In sum, the Court does not find that a new trial is warranted and thus will deny that portion of Defendants' motion.

**B.    Plaintiff's Motion**

Given that the Court has remitted the award to nominal damages, the Court will deny Plaintiff's motion for prejudgment and post-judgment interest (D.I. 264) as moot.

**IV.    CONCLUSION**

For the foregoing reasons, Defendants' renewed motion for judgment as a matter of law or in the alternative, motion for a new trial and/or remittitur (D.I. 266) is GRANTED-IN-PART to

---

[12]    Furthermore, as noted at trial, the testimony regarding the $30,000,000 figure was immediately struck from the record, and the Court did not find that the brief testimony was likely to risk prejudicing the jury.  (D.I. 259 at 173:6-13; 270:12-23).

the extent it seeks remittitur of nominal damages and DENIED-IN-PART in all other respects, and Plaintiff's motion for prejudgment and post-judgment interest (D.I. 264) is DENIED as moot.  An appropriate order will follow.